UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Andra T. Robinson,

     Plaintiff,

v.                                    Case No. 07-10421

Radian, Inc., a/k/a Radian, Inc.            Honorable Sean F.  Cox
of Virginia, d/b/a DRS Technical
Services, Inc.,

     Defendant.
_____/

**OPINION & ORDER**

     In this whistleblower action, Plaintiff asserts two claims against his former employer: 1) a

claim that his former employer retaliated against him for being "about to report" suspected

violations of law to a public body in violation of Michigan' Whistleblower Protection Act

("WPA"); and 2) a claim that his former employer retaliated against him in violation of

Michigan's public policy for his internal reporting and refusal to violate the law.  The matter is

currently before the Court on Defendant's Motion for Summary Judgment.  The hearing was

originally scheduled for January 24, 2008, but was adjourned because the Court requested

supplemental briefing to address issues not addressed in the parties' initial briefs.  After the

requested supplemental briefing, the Court heard oral argument on March 20, 2008.

     For the reasons below, Defendant's Motion for Summary Judgment shall be GRANTED

IN PART AND DENIED IN PART.  The motion shall be granted with respect to Plaintiff's

claim under Michigan's WPA.  The motion shall be granted in part and denied in part with

respect to Plaintiff's public policy claim in that the Court concludes that Plaintiff cannot maintain

a public policy claim based upon his internal reporting, but that Plaintiff can proceed with his

public policy claim that he was retaliated against for refusing to violate the law.

BACKGROUND

A.    Procedural Background:

Plaintiff Andra T. Robinson ("Plaintiff" or "Robsinson") filed this action against

Defendant Radian, Inc., a/k/a Radian, Inc. of Virginia, d/b/a DRS Technical Services[1]

("Defendant" or "Radian") on January 26, 2007.  Plaintiff's claim arises out of his employment

relationship with Defendant, his previous employer.  Defendant is a corporation which provides

engineering and technical services to military and commercial customers.  (Pl.'s Compl. at ¶ 8;

Def.'s Answer at ¶ 8).  Plaintiff began working for Defendant on or about March 7, 2005, as a

senior contracts administrator.  (*Id.* at ¶ 9).  Plaintiff's First Amended Complaint asserts the

following claims against Defendant: "Michigan's Whistleblower's Protection Act" (Count I); and

"Retaliation in Violation of Public Policy ('Public Policy Tort')" (Count II).

The Court originally scheduled Defendant's Motion for Summary Judgment to be heard

on January 24, 2008, but adjourned the hearing date and issued an order allowing supplemental

briefing to address a threshold issue regarding Plaintiff's WPA claim that was raised by

authorities cited by Plaintiff, but not addressed by either party in their initial briefs.

---

[1]Defendant states that Plaintiff has "incorrectly named the defendant in these proceedings. As of March 2005, when Plaintiff commenced employment with defendant, the Company was known as Radian, Inc. ("Radian").  On January 30, 2006, Radian was acquired by DRS Technologies, Inc. and, in November 2006, Radian was merged with and into DRS Technical Services, Inc."  (Def.'s Br. at 1).

B.     Factual Background:

Plaintiff is a member of a minority group and a Vietnam Veteran.  (Pl.'s Aff. at ¶ 4).

Defendant is a government defense contractor, with operations throughout the United

States.  A significant portion of the work performed by Defendant at its Troy, Michigan facility

relates to providing armor for vehicles engaged in support of the Iraq war.  (Def.'s Statement of

Material Facts Not in Dispute at ¶ 1, and Pl.'s Resp. to same).  Several of Defendant's employees

had previously worked with for the Army's Tank Automotive Command ("TACOM") before

coming to work for Defendant.  (*See* Pl.'s Br. at 2).[2]

In the Fall of 2005, Defendant's armor work for the Department of Defense had increased

as a result of news stories concerning the lack of armored protection for American troops.

(Def.'s Statement of Material Facts Not in Dispute at ¶ 2, and Pl.'s Resp. to same).  Because the

workload in Defendant's Troy facility was increasing, and representatives of TACOM advised

Defendant's leadership that they thought it would be to Defendant's advantage to have a senior

contracts person in the Troy facility, a new position was created.  (Mailey Dep. at 32-33).

Plaintiff was hired to fill that newly created position at the Troy facility on March 7, 2005.

(Def.'s Statement of Material Facts Not in Dispute at ¶ 4, and Pl.'s Resp. to same; Ex. 3 to Def.'s

Br.; Ex. D to Pl.'s Br.)  Defendant's documents indicate that Plaintiff was hired at a salary that

was $10,000.00 over the requisition and that Plaintiff had "superb qualities" and "really hit it off

w/ Oughton & Macik."  (Ex. D. To Pl.'s Br.).

Plaintiff testified that as a contract administrator, it was his job to make sure that the

_____

[2]Plaintiff had also briefly served in the Army many years prior to coming to work for
Defendant.  (Pl.'s Dep. at 16).

company was in compliance with all contract requirements and with regulations. (Pl.'s Dep. at 72-74). That is, it was his responsibility to "identify risks and eliminate" those risks for the company. (*Id*.). Plaintiff believed that his responsibilities included dealing with EEO compliance issues. (*Id*. at 72-73). Mailey also considered that issue within Plaintiff's job responsibilities. (Mailey Aff. at ¶ 17).[3]

At the time that Plaintiff was hired, Hugh McLeod ("McLeod") was the Director of the Troy facility, but he was later replaced by John Macik ("Macik"). Plaintiff supported McLeod and Macik on the programs being sought by and awarded to the Troy facility. (*See* Macik Affidavit). Plaintiff's immediate supervisor, however, was Jerry Mailey ("Mailey"), the Director of Contracts, who was based in Virginia. (Ex. 3 to Def.'s Br.; Mailey Affidavit, attached as Ex. 4 to Def.'s Br.).

Mailey gave Plaintiff an overall performance rating of "fully meets expectations" on his 90 Day Review. (Ex. 7 to Def.'s Br.). Plaintiff testified that Mailey did not meet with Plaintiff at that time, but rather, sent him a copy of the document. (Pl.'s Dep. at 66).

Mailey states that since he was in Virginia, at the time of Plaintiff's first annual performance review in January 2006, he sought input regarding Plaintiff's performance from the directors at the Troy facility whom Plaintiff was hired to support. (Mailey Affidavit). In a letter dated January 20, 2006, McLeod stated the following:

> Attached are summaries of incidents that reflect Andra Robinson's inability to perform at the level for which he was hired. They illustrate the lack of qualities I expect from someone of his purported background, experience and overall qualifications, particularly as they pertain to the support Land Systems Division

---

[3]Macik, on the other hand, testified that he thought that was an issue for HR. (Macik Dep. at 34-35).

needs.

> These quality shortfalls include substantive contribution, quality work, precise and accurate products, initiative and assuming action ownership, ability to perform complex contracting actions, sense of urgency and sensitivity to deadlines, team play, willingness to put in extra time to complete actions, and so forth.

> In my view, Andra simply shirks responsibility and work. He appears to be attempting to get by with doing the absolute minimum and only the simple and routine. My impression is that he wants to be an action coordinator and reviewer, an information conduit. He does not want to be a doer.

> Andra is very deficient in his willingness and ability when it comes to the more complex, and typically urgent tasks. He always has an explanation for his not accomplishing these tougher, time sensitive tasks, which usually involve someone else purportedly not doing supporting work.

> I cannot comment on the state of Andra's basic contracting work requirements such as record keeping. And no one from Radian HQ has visited since he was hired to check on how well he is performing in those areas. However, I am told there may be deficiencies there.

> Andra's office door is closed at least half of almost every day. He comes in early, about 0700, and leaves early, between 1500 and 1600. And on many a Friday, he leaves at noon.

> Andra's KBR contract action failure was the culmination of my frustration with his inability to perform. I now have no confidence in his ability to perform in the future any of the duties for which he was hired to perform.

I have sent emails to you from time to time addressing Andra's poor performance. You should refer to those as well as the attached in completing his annual performance appraisal.

> Recommend that you give Andra his appraisal in person in Troy. That would enable you to check into the quality of his basic contract operational requirements. Further, that would enable me to sit in on the appraisal should you so desire.

(Ex. 4 to Def.'s Br.). Attached to the letter were more detailed criticisms of Plaintiff's

performance. (*Id*.).[4]

---

[4]In an e-mail dated January 25, 2006, Macik also provided comments regarding Plaintiff's performance. The e-mail stated: "Here is my view point on the support I'm receiving from

The record also indicates that Plaintiff completed a self-appraisal in January of 2006 which, in a section relating to relationships with others, Plaintiff indicated "overall okay, I have found some coworkers not open to correction on contract or compliance matters." (Mailey Dep. at 167-68). When asked questions relating to concerns that he may have discussed with Plaintiff on that topic, Mailey testified as follows:

Q. Do you know what he was referring to?
A. I think it's – part of it would be what you were just talking about, about the hiring process.
Q. Okay. Some of the questions we covered earlier with regard to Mr. Macik?
A. Yes.
Q. Macik?
A. Yes.
Q. Okay.
A. And the other thing is the program folks up there to a large extent were used to doing their own thing and didn't necessarily like anybody in contracts saying, well, yeah, you're not supposed to say that, do that, go there, that sort of thing. But that's part of our job, is to tell people how to follow the rules.
Q. Okay.
A. Now – and – and – and I have had – you know, I did have discussions with Andra about stuff like that about, yes, it's your job to tell them sometimes things that they might not want to hear --
Q. Right.
A. – and that's okay.

(Mailey Dep. at 168-70).

---

Andra. This individual is basically working about 4 1/2 days a week and everybody else is doing his work. As an example, Sandy requires all of the pricing for Andra's task be done by Brian. This situation continues to get worse. For the past month, Andra is keeping his door closed all day and some time not answering his phone (when you know he is at his desk). All Program Managers at Troy don't want to work with him." (Ex. 4 to Def.'s Br.). A two-page attachment to Macik's e-mail set forth numerous specific complaints regarding Plaintiff's performance.

During January 2006, Plaintiff concluded that Defendant was not in compliance with certain federal statutes and regulations. (Def.'s Statement of Material Facts Not in Dispute at ¶ 10, and Pl.'s Resp. to same). Specifically, Plaintiff believed that some positions were being filled at the Troy Facility without having first posting the open positions, as required under federal regulations, a practice that Plaintiff referred to "pre-selection." (Def.'s Statement of Material Facts Not in Dispute at ¶ 11, and Pl.'s Resp. to same).

Plaintiff first reported his concerns regarding pre-selection issues to representatives of Defendant's Human Resources Department. He first reported those concerns on January 24, 2006. (*See* Pl.'s Resp. To Def.'s Statement of Material Facts Not in Dispute at ¶ 12; Ex. 9 to Pl.'s Br.). Plaintiff states that "[u]pon requests for further information by HR, he provided specific citations substantiating his concern, which Mailey at best approved." (*Id.*; Ex. H to Pl.'s Br.). At least one of Plaintiff's e-mails, however, indicates that Mailey asked Plaintiff to do further research on the issues in question. (*See* Ex H to Pl.'s Br., at DRS0001852). Various e-mails submitted by Plaintiff show that he engaged in a dialog with various HR representatives during January and February of 2006, during which he was asked for further information. (*See, e.g.*, Ex. H to Pl.'s Br.). In an e-mail dated February 13, 2006, Plaintiff sent information regarding pre-selection issues to HR representatives and Mailey and stated, "Please review and provide comments. I am in the process of reviewing the Federal Contract Compliance Manual to assess Troy's compliance risk." (*Id.*).

Plaintiff's affidavit states that in approximately February 2006, when he confronted Macik about a "pre-selection," "Macik responded in a very hostile tome with words to the effect, 'I can hire anyone I want to.'" (Pl.'s Aff. at ¶ 11).

In March, 2006, Mailey prepared Plaintiff's Annual Performance Appraisal, which gave

Plaintiff an overall rating of "does not meet expectations often enough." (Mailey Affidavit and

attachments marked DRS 00185-187). Mailey states that he and Plaintiff then discussed the

review on March 10, 2006, and Plaintiff "considered the comments in Section IV (Describe the

employee's weaknesses) which included 'Does not seem to be focused on job - distracted-

withdrawing' was subjective and asked that the comments be removed." (Mailey Affidavit and

attachments). He states that Plaintiff then removed all comments about his weaknesses before

signing and returning it to him. (*Id*.)

In May, 2006, Defendant began reducing some of its work force at the Troy Facility.

(Stovall Dep. at 18-19).

On May 31, 2006, Plaintiff was asked to sign off on an employee requisition and

responded as follows: "We are required by the FAR to post all opening. Mr Wikman can apply

to posting; we can not pre-select candidates." (Ex.I to Pl.'s Br.).

In an e-mail dated August 14, 2006, Macik stated the following to Mailey regarding

"Personnel Usage":

> I attended the start of work meeting with you (that Mitch Rambler hosted) for the
> new[5] company. During that meeting he asked all of us to look at the utilization of
> our direct and indirect personnel (regardless of whom they were actually
> assigned). I have to report that our Senior Contracts Analyst (Andra Robinson) is
> under utilized. When you hired for that position, to support all of our armor
> projects we were at 72 personnel and revenue or 20 to 30 million a year). During
> the last two years we have seen personnel go as high as 114 (with revenue over 90
> million). This year we have experienced a reduction back to the years before the
> armor requirement, around 77 personnel (and revenue around 50 million to 60
> million). What I'm trying to describe is a bubble that has pasted [sic]. I

---

[5]Radian was acquired by DRS Technologies, Inc. and merged with and into DRS
Technical Services, Inc.

recommend that the Senior Contract Analyst position at the Troy office be abolished.  I would also recommend that Andra be offered a position in Alexandria (if there is an opening).

(Ex. 16 to Def.'s Br.).

Mailey's Affidavit states that Plaintiff's performance did not improve following his March 2006 review.  (Mailey Affidavit).  He states that on September 27, 2006, he met with Plaintiff to provide him with a letter outlining his concerns.  (*Id.*).

The September 27, 2006 letter presented to Plaintiff addressed four areas of concern with Plaintiff's performance: attendance, accessibility, workload, and demeanor.  (*See* Ex. 4 to Def.'s Br. at DRS00219-220).  For example, with respect to accessibility, the letter stated:

> I am told that you frequently (depending on who is speaking: 'Much of the time', "more often than not', and 'mostly') have your door closed and have been seen wearing headphones, giving the impression that you are inaccessible.  First, there is no place at work for headphones – if you have some at work please take them home today.  Second, we all occasionally need to close the door to do some work that requires intense concentration or privacy.  But routine closing of the office door is not acceptable.  It has also been reported that while working from home, you do not respond to e-mails.  Moving forward, I expect that your door will be open the vast majority of the time and closed at most an hour or two a week and you will make a concerted effort to promptly respond to communications.

(*Id.*).  The letter detailed Mailey's concerns about the other areas as well and set forth what would be expected moving forward.  (*Id.*) The letter indicated that Plaintiff would be formally reviewed again in 90 days and that if sustained improvement is not made, disciplinary action, up to and including termination, would be taken.

Two days later, on September 29, 2006, Plaintiff sent Mailey an e-mail responding to his letter and visit and copying Mary Stoval from Defendant's HR Department.  (Ex. 15 to Def.'s Br.).  Plaintiff's e-mail stated, in pertinent part:

Using Mr. Mailey's term this is more of the smoke provided in the past; allegations without support or foundation. These attacks began when I fail to support or ratify what I considered a poor management decision. (For example: Hiring a Program Manager when we already had a qualified Program Manager that was underutilized and charging to overhead). After the first attack I provide HR documentation to support minority, veteran, and Vietnam Era veteran status.

After our meeting, 27 September 2006, I found in my research that flextime, closed office doors, and earphones are considered reasonable accommodations under ADA for my disability. Please accept this as my disclosure of my adult ADD and a formal request for these accommodations under the ADA . . .

**In our discussion Mr. Macik stated and Mr. Mailey concurred that if there was a cut back in contracts Mrs. Rinaldi would stay and I would be cut.** Would this predetermine decision be in compliance with FAR 52.222-21 thru 29? In my short tenure with DRS Radian minority turnover appears to be excessive – this should cause concern in an organization that values and promotes diversity.

Dr. Deming stated managers must drive out fear in the organization. Sigmund Freud stated the military was an artificial group using fear to bring about conformance. I have learned an employee has three choices in an organization 1) conform 2) change it 3) exit it. I elect to assist in the change [sic] this organization.

I have noted to Troy management, Mr. Mailey, and Human Resources in Alexandria non-compliant practices in hiring in Troy. **If general compliance to required contractual clauses relating to Affirmative Action and Equal Employment Opportunity are not achieved and the personal specific baseless attacks on my integrity, work, and ability do not end; my only option would be to file a written and well documented complaint to OFCCP.**

(*Id*.)(emphasis added). This was the first and only time that Plaintiff indicated that he may report any alleged concerns to the OFCCP or any other public body. (Pl.'s Compl. at ¶ 13; Pl.'s Dep. at 162). On that same date, September 29, 2006, Plaintiff sent an e-mail to Ruchelman that stated:

I copy you on an email concerning a letter placed in my personnel folder 27 Sept 06. My unwillingness to sign and approve all management actions needing contracts signature has created for me a somewhat hostile work environment and many unsupported negative assertions about my integrity and performance.

(Ex. V to Pl.'s Br.).

On October 6, 2006, Macik again recommended that the Senior Contracts position in

Troy be eliminated:

> I sent the below information to you on 14 August 2006. Since then I have had a permanent reduction in force of five engineers. I have also had some increases in the logistics area under two contracts, the ILSC and OTC LVSR program). I continue to believe that I have more contract resources than necessary to support my operations. I believe my requirements are one contract administrator (Mid-Level) and a part-time clerk (960 hours per year). I again recommend that the Senior Contract Administrator position be abolished and the employee offered a position in Alexandria, VA.

(Ex. 16 to Def.'s Br.).

On October 19, 2006, a Contract Manager in Virginia submitted his resignation effective

November 2, 2006. (Mailey Affidavit at ¶ 12).

On November 2, 2006, Defendant's Vice President of Contracts sent Plaintiff a letter that

stated, in pertinent part:

> As you are aware, DRS Technical Services, Inc. (DRS TSI) is comprised of several legacy companies and prior service organizations of DRS Technologies. DRS TSI is organized into four primary lines of business . . . I have structured the contracts organization to align with the segment's organizational structure. I have been working closely with my staff and DRS TSI's business owners to determine the resources needed to successfully manage the current portfolio of efforts and assist in the growth of DRS TSI. The Troy, Michigan, office has experienced a reduction in their programs, which has led to a change in the level of contract administration support needed specifically at that location. The quantity and complexity of the workload has been significantly reduced. At the same time, the quantity and complexity of the contract administration support for other programs has increased significantly.

> Based on the above, **the decision has been made to relocate your position to the Northern Virginia area.** This position would support our Coast Guard and Air Force Operations efforts with some continuing support of Troy non-PEO CS&CSS work . . . Your anticipated relocation date is December 4, 2006 or as otherwise mutually agreed to in writing. Your position will continue to be classified as full-time, exempt, with an annual salary of $78,000.00. Your supervisor will continue to be Jerry Mailey. In the short term, the location for this

position is the Alexandria, VA office.  It is anticipated that the Alexandria office
will be moving to the Dulles area within the next year as part of continuing
consolidation efforts . . .

We would be pleased if you would accept this offer.  I understand that this is a
decision not to be taken lightly, however, your response is required by November
10, 2006 in order to meet the Engineering and Logistics Line of Business
requirements . . .

Please indicate your decision below.

(Ex. N to Pl.'s Br.)(emphasis added).  At the bottom of the letter were spaces for Plaintiff to

indicate "accept" or "decline" and a line for his signature.  (*Id*.).

On November 10, 2006, Plaintiff declined the offer in writing, stating, "Thank you, for

the vote of confidence in my work as a contracts professional.  After carefully evaluating your

offer; I must decline."  (Ex. 21 to Def.'s Br.).

On November 10, 2006, Plaintiff then contacted HR representative Andrea Ruchelman

("Ruchelman") via e-mail stating:

On 29 September 2006 I sent two e-mails to you regarding baseless negative
comments relating to my integrity, my work ethic, and work quality.  This
morning I copied you on a letter regarding my relocation to Virginia.

It is my opinion that these hostile actions are the result of my actions to correct
noncompliant hiring practices (FAR Subpart 22 and 52.222.24-26, and 35-39) and
other questionable practices.  I have patiently worked to correct these practices
internally; but my ability to endure this ever increasing hostile environment is
quickly being taxed.

(Ex.19 to Def.'s Br.).  Ruchelman then spoke to Plaintiff.  She testified that Plaintiff was unsure

as to what he wanted to do and asked about the ethics office conducting an investigation.

(Ruchelman Dep. at 64).  Ruchelman informed Plaintiff that if he decided to make a complaint

her office would conduct an investigation.  (Ex. 20 to Def.'s Br.; Ruchelman Dep. at 64-65; Pl.'s

Dep. at 151 & 153). Plaintiff testified that he never made a formal complaint, however, because he "didn't have time to do that" during the month and a half that he continued to work for Defendant. (Pl.'s Dep. at 151-52).

On November 30, 2006, Defendant's Director of HR sent a letter to Plaintiff that stated, in pertinent part:

> I regret to inform you that, effective December 29, 2006, we will no longer require your services. Due to a restructuring of the contracts organization and a reduction in the Troy programs, **the Senior Contracts Administrator position is being relocated to the Northern Virginia area. In a letter dated November 2, 2006, you were offered the position in Northern Virginia, but you declined. As such, we will be eliminating your position in Troy, Michigan.**

(Ex. 22 to Def.'s Br.)(emphasis added). Plaintiff's last day of employment with Defendant was December 22, 2006. (Pl.'s Am. Compl. at ¶ 19).

Plaintiff filed this action on January 26, 2007. It is undisputed that Plaintiff never filed a report with the OFCCP, or any other public body, either before or after his employment with Defendant.

Standard of Decision

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*

*v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

ANALYSIS

I.    Plaintiff's WPA Claim:

Actions under the WPA are analyzed using the "shifting burdens" framework utilized in retaliatory discharge actions under Michigan's Elliott-Larsen Civil Rights Act.  *Roulston v. Tendercare (Michigan), Inc.*, 239 Mich.App. 270, 280-81 (2000).  Under that framework, the plaintiff bears the initial burden of establishing a prima case.  *Id.*  If the Plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action.  If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff then has the opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only pretext.  *Id.*

A.    Can Plaintiff Establish A Prima Facie Case Under The WPA?

The parties agree that to establish a prima facie case under the WPA, Robinson must establish that: 1) he was engaged in protected activity; 2) he was subsequently discharged, threatened, or otherwise discriminated against; and 3) a causal connection exists between the protected activity and the adverse action.  (Pl.'s Br. at 13; Def.'s Br. at 10)(citing *Chandler v. Dowell Schlamberger, Inc.*, 456 Mich. 395, 399 (1998); *Brown v. Mayor of Detroit*, 271 Mich.App. 692, 706 (2006)).

1.    Protected Activity

An employee is engaged in a protected activity under the WPA if he has reported, or is

about to report, a suspected violation of law to a "public body." *Shallal v. Catholic Social Svs. of Wayne County*, 455 Mich. 604, 610 (1997).

> a.     "Public Body"

In order to constitute protected activity under the WPA, Plaintiff must establish that he reported, or was about to report, suspected violation of law to a "public body." The WPA defines the term "public body" in the statute:

> (d) 'Public body' means all of the following:
> (I) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.
> (ii) An agency, board, commission, council, member, or employee of the legislative branch of state government.
> (iii) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.
> (iv) Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.
> (v) A law enforcement agency or any member or employee of a law enforcement agency.
> (vi) The judiciary and any member or employee of the judiciary.

M.C.L. § 15.361(d). Michigan case law, including the *Hall* decision that Plaintiff relied on in his brief, reflects that the WPA's definition of "public body" does not include federal agencies. *Hall v. Consumers Energy Co.*, 2006 WL 1479911 (Mich. App. 2006). That decision indicates that a plaintiff who alleges that he was wrongfully discharged for having reported, or being about to report, a suspected violation of law to a federal agency has not engaged in activity that is protected by the WPA and therefore cannot maintain a claim under the WPA. *Id.*

Here, Plaintiff's WPA claim is based upon his assertion that he "was about to report

violations of law [he] discovered to the Office of Federal Contracts Compliance Programs (OFCCP)."  (Pl.'s Afft. at ¶ 19).  Because the OFCCP appears to be federal agency, after reviewing the initial briefs, the Court was concerned that, under *Hall,* Plaintiff may not be able to maintain a WPA claim as a matter of law.  The Court therefore raised the issue and gave both parties an opportunity to address it in supplemental briefs.

In his supplemental brief, Plaintiff acknowledged that the issue of whether a federal agency can be considered a "public body" under the WPA has been in some dispute in the past. Plaintiff maintains, however, that a recent decision, *Ernsting v. Ave Maria College*, 274 Mich.App. 506 (2007), establishes that a federal agency such as the OFCCP can be considered a public body under the WPA.

In response, Defendant asserts that a "better analysis of the issue" is found in the dissent in *Ernsting*, wherein the dissent concluded that the phrase "law enforcement agency" refers to an agency that has as its primary purpose the enforcement of general criminal laws.  (Def.'s Response at 2).

The Court concludes that Plaintiff has satisfied the public body requirement.

Although *Hall* noted that the statutory definition of public body in the WPA does not specifically include a federal agency, that case did not address whether a federal agency could be considered a public body under another subsection of the statute because it is a "law enforcement agency."[6]  That issue was recently addressed, however, in the *Ernsting* case that Plaintiff relies on.

---

[6]That is, *Hall* held that a federal agency does not qualify as a public body under M.C.L. § 15.361(d)(I), but did not address whether a federal agency could be considered a public body under subsection (d)(v) as a "law enforcement agency."

In *Ernsting*, the Michigan Court of Appeals held that under the plain language of the statute, a federal agency may qualify as a law enforcement agency and, thus, as a public body under the WPA. *Ernsting*, 274 Mich.App. at 514-15. The court then considered whether the specific federal agency at issue in that case, the Department of Education, qualifies as a law enforcement agency under the WPA and concluded that it does, based on the specific powers granted to it to detect and punish violations of the law.

The Court agrees with Plaintiff that the OFCCP has similar powers granted to it to detect and punish violations of the law and, therefore, it falls within the definition of law enforcement agency in the WPA under *Ernsting*.

        b.      <u>"About To Report"</u>

Again, an employee is engaged in a protected activity under the WPA if he has reported, or "is about to report," a suspected violation of law to a public body. *Shallal v. Catholic Social Svs. of Wayne County*, 455 Mich. 604, 610 (1997).

Here, Robinson acknowledges that he did not actually report a violation to a public body. (*See* Pl.'s Resp. at 13). Rather, he contends that he has an actionable WPA claim because he was "about to report" a suspected violation.

The WPA "restricts recovery under the act by requiring a nonreporting employee to establish being 'about to' report by offering clear and convincing evidence." *Shallal v. Catholic Social Svs. of Wayne County*, 455 Mich. 604, 611 (1997); M.C.L. § 15.363(4). In *Shallal*, the Michigan Supreme Court explained that because the statute does not explain what constitutes "about to" report, it examined the purpose of the act for guidance. It noted that "[l]egislative analysis indicates that the 'about to' report language was added to the bill to protect

conscientious employees who intended to, but were discharged in retaliation before they could, report." *Id.* (citations omitted).

An employee who is about to report a suspected violation is one who is "on the verge of" doing so. *Id*. The language of the WPA "intentionally reduces employee protection the more removed the employee is from reporting to a public body.*" Id.; Jennings v. County of Washtenaw*, 475 F.Supp.2d (E.D. Mich. 2007).

Plaintiff's Affidavit states that "[a]t the time I received my letter of termination, I fully intended to and was about to report the violations of law I had discovered to the Office of Federal Contracts Compliance Programs (OFCCP)." (Pl.'s Aff. at ¶ 19). He states that he did not make the report because he was terminated. (*Id*. at ¶ 21).

Defendant contends that no reasonable jury could determine under the heightened standard (i.e., having to show by clear and convincing evidence) that Plaintiff was "on the verge of" reporting a suspected violation at the time of his termination. Defendant states that Plaintiff had more than 7 months from the time he first raised his internal concerns until he made his threat to report an allegation and, even then, he stated would report his concerns only if he continued to receive negative performance evaluations. Defendant states that Plaintiff then remained employed with the company for three months without ever following through on his threat and did not report his concerns even after his termination.

Defendant notes in its Reply Brief that Plaintiff acknowledges that, at the time he threatened to report the suspected violations on September 29, 2007, Plaintiff had already researched the appropriate place to report his concerns (the OFCCP), and had already collected specific information to disclose in support of such a report. (*See* Pl.'s Resp. Br. at 14).

Nevertheless, Plaintiff never made any such report, either before or after he was terminated two full months later.

In response, Plaintiff contends that there is a question of fact as to whether he was about to report a suspected violation. He contends that if a jury believed his affidavit, that, in addition to "contemporaneous evidence" of his intention to report, it could conclude that he was "about to report" the suspected violation.

The "contemporaneous evidence" that Plaintiff speaks of, however, is not evidence of actions that Plaintiff took at the time he received his termination letter on or about November 30, 2006. Rather, Plaintiff states:

> Robinson directly advised Defendant on **September 29, 200[6][7]** that he believed he was being retaliated against concerning his efforts to uncover unlawful hiring practices and that he would report this and the underlying unlawful conduct if it continued. Def. Exh. 15. Robinson had **already at that time** researched the appropriate place to report his concerns, OFCCP, and conveyed as much in his letter. *Id.* His note also made clear that Robinson's report would be 'well-documented' **because by that time Robinson had collected specific information to disclose** in support of his whistleblowing.

(Pl.'s Br. at 14)(emphasis added). Thus, the "contemporaneous evidence" that Plaintiff speaks of is not evidence of actions Plaintiff was taking in November 30, 2006. Rather, that shows that a **full two months before** he was allegedly "on the verge of" reporting the suspected violations to a public body, he had done research, had determined the appropriate agency to report the suspected violations to, and had gathered information for a such a report. Nevertheless, he reported nothing.

After reviewing several cases looking at this issue, the Court agrees with Defendant that a

---

[7]Plaintiff's brief erroneously listed the date as September 29, 2007, but the actual date was September 29, 2006.

reasonable jury could not find that there is "clear and convincing evidence" that Plaintiff was "on the verge of" reporting the suspected violations to the OFCCP when he received his termination letter on November, 30, 2006. *See e.g.*, *Richards v. Sandusky Comm. Schools*, 103 F.Supp.2d 753 (E.D. Mich. 2000); *Richards v. Metron Integrated Health Sys.*, 2004 WL 443991 (Mich.App. 2004); *Trosien v. Bay County*, 2005 WL 3505746 (Mich.App. 2005); and *Jennings v. County of Washtenaw*, 475 F.Supp.2d 692 (E.D. Mich. 2007).

c.    <u>Good Faith Belief</u>

Next, Defendant asserts that Plaintiff cannot establish that he was engaged in protected activity because the WPA has a good faith requirement and Plaintiff "lacked a good faith basis for believing that the Company was not in compliance with the posting requirements at the time he 'threatened' to report his unfounded suspicions." (Def.'s Br. at 13). Defendant states that at the time he made his threat to report, it was months after he had raised his concerns internally and Plaintiff did not do any personal investigation as to whether compliance issues still existed. It contends that if Plaintiff had done so, he would have learned that the company was in compliance. The only authority Defendant cites in support of this argument is an unpublished opinion that states that "a whistleblower plaintiff cannot make a wholly unfounded or unreasonable assertion that there has been or will be a violation of the law without running afoul of the WPA's underlying good faith requirement." *DeMaagd v. City of Southfield*, 2006 Mich.App. LEXIS 2489 (attached as Ex. 24 to Def.'s Br.).

Plaintiff responds by correctly noting that the WPA protects reports of "suspected" violations of the law, not only true or ultimately proven violations of the law.

Under this record, there is more than sufficient evidence to create an issue of fact as to

whether Plaintiff had a good faith belief that a violation had occurred.[8]  The Court therefore finds that this asserted ground for relief lacks merit.

  2.  Causal Connection

   a.  "Primary Motivation"

Defendant also contends that Plaintiff cannot establish the requisite causal connection because he acted only out of personal concern to immunize himself from discipline.  It asserts that, contrary to *Shallal,* he is trying to use the WPA as a defensive weapon in response to job performance criticism he received just two days before he made his conditional threat. Defendant contends that Michigan law requires that a whistleblower's primary motivation be a desire to inform the public, not to act in self interest.  Defendant contends that like *Wolcott* and *Shallal,* Plaintiff used his knowledge in an attempt to influence Defendant not to discipline or fire him and that he had no good faith intention to inform the public.

Plaintiff acknowledges that "there is a split of authority" on this issue.  Plaintiff contends, however, that "even the Michigan authority that indicates that public good should be a concern for a whistleblower falls well short of suggesting that the public good must be a whistleblower's *sole* concern."  (Pl.'s Br. at 17).  Plaintiff relies on *Trepanier v. National Amusements, Inc.*, 250 Mich.App. 578 (Mich.App. 2002) to support his position.  Plaintiff contends that a genuine issue of fact exists where reasonable jurors could conclude that Plaintiff was acting in the public's interest, in addition to his own interest.

_____

[8]Moreover, as Plaintiff notes, Defendant's position on this issue (i.e. that Plaintiff's concerns were entirely unfounded) is entirely inconsistent with its position that Plaintiff identified a potential compliance issue, but that Defendant altered its practices in order to ensure compliance.

The case that Plaintiff relies on to support his position, *Trepanier,* however, did not involve a conditional threat to report. That decision specifically noted that the plaintiff "did not use his protected activity to extort his employer, as did the plaintiff in Shallal." *Trepanier*, 250 Mich.App. at 587.

Based on the following three cases, the Court concludes that Plaintiff cannot establish a prima facie case because, under the facts of this case, no reasonable juror could conclude that his primary motivation in threatening to report Defendant was a desire to inform the public: 1) *Wolcott v. Champion Int. Corp.*, 691 F. Supp. 1052 (W.D. Mich. 1987); 2) *Shallal, supra*; and 3) *David v. ANA Television Network, Inc.*, 2000 WL 222575 (6tth Cir. 2000).

In *Wolcott,* the plaintiff was a mechanic at one of defendant's shops. On April 12, 1985, defendant held a meeting at which plaintiff was present. The main focus of the meeting was defendant's reduction of operations, including closing some offices. Plaintiff, who did not agree with defendant's planned cutbacks, mailed a threatening letter to defendant following the meeting. The letter laid out numerous grievances and threatened, among other things, to report alleged violations to the DNR and EPA if defendant did not engage in discussions with plaintiff and his co-workers and consider giving certain laid off employees their jobs back.

After defendant received the letter, it initially suspended defendant. A week later, on June 14, 1985, defendant recommended that the mechanic's position at plaintiff's shop be eliminated based on the proposed cutbacks in ownership of heavy equipment.

On June 17, 1985, plaintiff filed a complaint with the Michigan Department of Public Health. Thereafter, plaintiff filed reports with the DNR and the Michigan Department of Labor.

On July 31, 1985, plaintiff was notified that his position had been eliminated. Plaintiff

then filed suit against his employer and his complaint included a retaliation claim under the WPA.

The trial court concluded that plaintiff had not established a prima facie case of retaliation under the WPA because he could not establish a causal connection. The court explained that Plaintiff was aware of the planned scaling down of defendant's equipment operations for several months prior to his whistleblower activities and had been aware of the alleged problems at the shop for several years prior to notifying authorities. "Yet, Plaintiff did not exercise his civil duty by reporting these violations, as envisioned in the Act, until it became apparent that he and others might lose their jobs due to circumstances unrelated to the violations." *Id*. at 1059.

The court noted that the WPA "was not intended to serve as a tool for extortion." Rather, the primary motivation of an employee availing himself of whistleblower protection must be a desire to inform the public on matters of public concern, not personal vindictiveness. *Id*. at 1065. It concluded that plaintiff "clearly did not have the public interest in mind while threatening to report defendant unless jobs at the [shop where plaintiff was employed] were forthcoming." *Id.*

The court concluded that if it countenanced plaintiff's conduct, it would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so. Plaintiff has offered no evidence which suggests that the Michigan legislature intended the [WPA] to be used as an offensive weapon by disgruntled employees" and the Court therefore concluded that Plaintiff's WPA claim failed.

In *Shallal,* the plaintiff was an adoption department supervisor for defendant. About a year into his tenure, allegations arose that plaintiff's supervisor was drinking on the job and misusing agency funds. Plaintiff discussed the need to report her supervisor over the next year,

but never took any action while employed with defendant. After an incident occurred in which plaintiff was criticized, via a written report from Department of Social Services, for her inadequate actions relating to reports of abuse to child whose placement she supervised, plaintiff was called into her supervisor's office. The ensuing discussion became heated, and plaintiff threatened to report her supervisor's abuses of alcohol and agency funds if he failed to "straighten up." Nevertheless, Plaintiff was discharged based on the DSS report. Plaintiff never reported her supervisor, but rather, filed suit against Defendant asserting a retaliation claim under the WPA.

Citing *Wolcott* with approval, in *Shallal* the Michigan Supreme Court held that the **"primary motivation** of an employee pursuing a whistleblower claim 'must be a desire to inform the public on matters of public concern, and not personal vindictiveness.'" *Shallall*, 455 Mich. 621. (Emphasis added). The court also cited with approval the following passage from *Wolcott:*

> Where, however, an employee . . . keeps the matter quiet for more than a year, eventually revealing it not the appropriate authorities or even to others for the purpose of preventing public injury, but rather for some other limited and private purpose, however, laudable that purpose may appear to the employee, no such protection is afforded. [Otherwise] we would be discouraging disclosure and correction or unlawful or improper acts by encouraging employees to 'go along' and then keep quiet reserving comment or disclosure until a time best suited to the advancement of their own interests.

*Id.* at 621.

The court concluded that, like *Wolcott*, plaintiff used her own situation to extort defendant not to fire her and that under the facts at hand, "no reasonable juror could conclude that plaintiff threatened to report [defendant] out an altruistic motive of protecting the public.

Furthermore, it is clear that the decision to fire plaintiff was made before her threat to Quinn and that plaintiff knew of this decision as evidenced by her calendar entry." *Id.* Because plaintiff used the threat of reporting defendant to force him to allow her to keep her job, no reasonable juror could conclude there was a causal connection between her firing and the protected activity. "To hold otherwise 'would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so." *Id.* at 622.

In *David*, the plaintiff was employed by Defendant and worked as its national director of marketing and sales. After Defendant hired a new President and CEO, Plaintiff learned that the new President was preparing a memo to demote Plaintiff and take marketing and sales away from him. Upon learning that information, Plaintiff contacted his brother-in-law, an attorney, and approved a letter to Defendant's new President. The letter accused Defendant and its new President of employment discrimination and violations of Federal Communications Commission regulations, and threatened to file reports with state and federal agencies unless Defendant ceased its efforts to interfere with Plaintiff's duties as national marketing and sales director. *Id.* at *4. Plaintiff was then terminated and filed suit against Defendant alleging, among other claims, that he was retaliated against in violation of the WPA for threatening to report a violation to a public body. The Sixth Circuit affirmed the trial court's grant of summary judgment on the WPA claim, stating:

> As in *Shallal*, regardless of the plaintiff's potential for success on other prongs of the prima facie case analysis, he cannot establish in this matter the requisite connection between the alleged protected activity and the discharge. Michigan law demands that a whistleblower plaintiff's primary motivation be 'a desire to inform the public on matters of public concern, and not personal vindictiveness.' [*Shallal*] at 579 (quoting *Wolcott v. Champion Int'l Corp.*, 691 F.Supp. 1052, 1065 (W.D. Mich. 1987)). Here, the plaintiff's motives in threatening court or

agency action were not altruistic, but rather were intended merely to derail attempts by the employer to visit adverse job consequences upon the plaintiff. Under such circumstances, no jury could legally find in favor of David on this particular claim. The district court, therefore, appropriately granted judgment as a matter of law to the defendants on this cause of action.

*Id*. at *6.

In this case, Plaintiff claims that as of January 2006, he knew that Defendant was in violation of federal regulations. Plaintiff considered ensuring EEO compliance as part of his job, and supplied Defendant's HR Representatives with information on the issue. There is no evidence to indicate that during that time Defendant was aware that Plaintiff intended to make any report to the OFCCP. Rather, the only objective notice that anyone at the defendant company received indicating that Plaintiff may make a report to a public body was Plaintiff's September 29, 2006 e-mail – written just two days after Mailey's September 26, 2006 letter regarding Plaintiff's performance. Moreover, in that e-mail Plaintiff threatened to make a report to the OFCCP only "[i]f general compliance to required contractual clauses relating to Affirmative Action and Equal Employment Opportunity are not achieved **and the personal specific baseless attacks on my integrity, work, and ability do not end.**" (Ex. 15 to Def.'s Br.)(emphasis added). By that time, Plaintiff already knew where to report his allegations and had gathered all the documentation he believed he would need. Nevertheless, made no such report and continued working for Defendant until December 29, 2006, without ever making a report. Moreover, Plaintiff never reported his allegations to a public body even after his position was eliminated.

Thus, like the plaintiffs in the above cases, Plaintiff was aware of the alleged violations for a considerable period of time, yet only threatened to report such violations to a public body

when it was apparent that his job performance was being questioned.  Furthermore, like the situation seen in *Shallal* case, the evidence indicates that the challenged employment action (i.e. the decision to eliminate the Senior Contracts position at Troy and transfer Plaintiff to the Virginia office) had already been contemplated, *and that Plaintiff knew such actions were being contemplated*, before he made his threat, as evidenced in Plaintiff's September 29, 2006 e-mail which stated  "In our discussion Mr. Macik stated and Mr. Mailey concurred that if there was a cut back in contracts Mrs. Rinaldi would stay and I would be cut."  In addition, Plaintiff made a *conditional threat* to report his allegations only if the criticisms of his work performance did not end.  Finally, Plaintiff never made a report to the OFCCP, or any other public body, even after he stopped working for Defendant.

Under these facts, a reasonable jury could not conclude that Plaintiff's "primary motivation" was a desire to inform the public.  To allow Plaintiff's WPA claim to proceed under these facts would be to discourage disclosure by encouraging employees hold off blowing the whistle, or threatening to do so, until it becomes most advantageous for them to do so.

> b.      Temporal Relationship / Adverse Action Was Contemplated Before Plaintiff's Threat

Defendant also contends that Plaintiff cannot establish a causal connection between the protected activity and the challenged action (the elimination of Plaintiff's position in the Troy facility and his transfer to Virginia) because the evidence shows that very action was contemplated more than a month before Defendant received any objective notice that Plaintiff was considering reporting the alleged violations to the OFCCP.

Plaintiff responds by asserting that the "adverse action was not in fact contemplated 1

month before the threat." (Pl.'s Br. at 18). Plaintiff asserts that although Macik had written

Mailey in August suggesting the action, Macik "admitted that Mailey ignored the suggestion."

(Pl.'s Br. at 19)(emphasis in original). Plaintiff offers page 134 of Macik's deposition transcript

to support that assertion. On page 134, however, Macik does not testify that Mailey "ignored his

suggestion," but rather, simply explains why he sent a second e-mail to Mailey:

> Q.    Why did you write the second e-mail in October of '06?
> A.    I had sent the first one to Mr. Mailey, and he said he would consider it. I
>       hadn't heard anything and, my position changed from deputy director to
>       the director. So, I resent the e-mail.

(Macik Dep. at 134). Plaintiff contends that Mailey did not "take up Macik's suggestion in

earnest" until after Plaintiff's September 29, 2006 e-mail.

The Court concludes that Defendant is entitled to summary judgment on this additional

ground.

The WPA provides that an "employer shall not discharge, threaten, or otherwise

discriminate against an employee regarding the employee's compensation, terms, conditions,

location, or privileges of employment because the employee . . .reports or is about to report . . . a

violation or suspected violation of a law or regulation." M.C.L. § 15.362.

As noted in a previous section, Plaintiff never actually reported his allegations to any

public body, so he only engaged in protected activity if he can establish that he was "about to"

report his allegations. Plaintiff did not give any indication to anyone at Defendant that he may

report his allegations to the OFCPP, or any other public body, until his September 29, 2006 e-

mail. Thus, if Plaintiff engaged in any protected activity under the WPA he did not engage in

any protected activity until September 29, 2006. To proceed with his WPA claim, Plaintiff must

establish a causal connection between his alleged protected activity on September 29, 2006, and the challenged employment action.

To show causation, Plaintiff must show that "his participation in the protected activity led to the adverse employment action." *Jones v. City of Allen Park,* 167 Fed.Appx. 398, 406 (6th Cir. 2006)(citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1997)(stating that, in retaliation cases, the question is whether the employer would have reached the same decision even if the plaintiff had not engaged in protected conduct)).

More than a full month prior to any protected activity under the WPA by Plaintiff, however, on August 14, 2006, Macik recommended in writing that the Senior Contract position in the Troy facility be eliminated and also recommended that Plaintiff be offered a position in Virginia if there were an opening.[9] (Ex. 16 to Def.'s Br.). Mailey testified that the impetus to the elimination of Plaintiff's position at the Troy facility was that August e-mail from Macik. (Mailey Dep. at 132). Mailey also testified that once Ed Fadullon resigned in October 2006, he knew he had an opening in Virginia and knew he had "an extra person up in Troy" (Plaintiff), and therefore put together the letter offering him the transfer to Virginia. (Mailey Dep. at 121).

Although Macik did renew his written request on October 6, 2006, a date that followed Plaintiff's September 29, 2006 e-mail threat to Mailey and Stovall by about a week, Macik was not copied on the threatening e-mail and there is no evidence in the record to indicate that Macik

---

[9]In addition, before he sent his threatening e-mail to Mailey and Stoval on September 29, 2006, Plaintiff was aware that Mailey and Macik were considering eliminating his position at the Troy facility due to cutbacks because they had discussed the issue with him. (Ex. 15 to Def.'s Br.).

was even aware of it at the time he renewed his request on October 6, 2006.[10]

The Court finds that a reasonable jury could not conclude, based on the evidence in this case, that there was a causal connection between the challenged action and the alleged protected activity because the evidence indicates that Defendant would have taken the challenged action even if Plaintiff had not threatened to make a report in his e-mail to Mailey and Stoval.

3.    Adverse Action:

For the second element of a prima facie case, Plaintiff must establish that he was subsequently discharged, threatened, or otherwise discriminated against (i.e., that he suffered an adverse action).

Plaintiff's complaint alleges that he was discharged and/or constructively discharged. (Am. Compl. at ¶ 20).

Defendant asserts that Plaintiff "was not discharged, threatened, or otherwise discriminated against as required to establish a prima facie case." (Def.'s Br. at 17). Defendant notes that Plaintiff was given the opportunity to transfer with no decrease in title, pay or benefits, but rejected the offer for personal reasons. Defendant asserts that the lateral transfer of Plaintiff's position does not constitute an adverse action for purposing of a prima facie case. Defendants rely on several cases, including *Kocis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996); *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535 (6th Cir. 2002) and *Strouss v. Mich. Dept. of Corr.*, 250 F.3d 336, 343 n.2 (6th Cir. 2001)(which cites *Darnell*).

_____

[10]Mailey testified that he did not talk to anyone about Plaintiff's concerns in the September 29, 2006 e-mail. (Mailey Dep. at 170-173). At oral argument, Plaintiff's counsel acknowledged that she could not identify any evidence in the record to indicate that Macik was aware of Plaintiff's September 29, 2006 e-mail on or before October 6, 2006.

Plaintiff contends that this challenge to the prima facie case is "truly an odd argument. Robinson is not working for Defendant today; he was terminated according to Defendant's own records." (Pl.'s Br. at 19). In a footnote, Plaintiff also states:

> If Defendant means to suggest that Plaintiff was given an alternative of moving to Virginia or being terminated, that too is false. Neither Mailey nor anyone else ever told Robinson that if he did not move he would be terminated. Mailey Dep. 124, 128-129; Robinson Aff. Para. 17. Furthermore, the transfer of his position to Virginia would amount to a constructive discharge, which is treated like any other termination under the WPA. *Champion v. Nationwide Sec., Inc.*, 450 Mich. 702 (1996); *Keller v. City of Grand Rapids,* 1998 WL 1992477 (Mich.App. 1998)*; Mollet v. Taylor,* 197 Mich.App. 328, 341 (1992).

(Pl'.s Br. at 19 n.6). Plaintiff's brief does not indicate, however, what record evidence would support his position that the transfer of his position would amount to a constructive discharge.

The Court concludes that Defendant is entitled to summary judgment with respect to this additional ground.

In *Darnell,* the plaintiff's employment was terminated by her employer after she declined to accept a lateral transfer to another city. The district court concluded that no adverse employment action was taken against Plaintiff and, therefore, granted summary judgment in favor of the employer defendant. The Sixth Circuit affirmed, stating:

> We agree with the approach used by the district court and hold, as have other courts in similar employment cases, that an employee's rejection of a lateral transfer precludes her from arguing that her termination was an 'adverse employment decision' for the purposes of establishing a prima facie case . . . We reach this conclusion for several reasons. There is an important distinction between 'eliminating a position' and 'terminating employment.' An offer of a lateral transfer places the decision of continued employment completely at the discretion of the employee. In this case, defendant's October 5, 1987 letter to plaintiff clearly indicated that her 'position' at the Newport office was being eliminated and, at the same time, that a new position was being created at the Alexandria office. Plaintiff had the option of continuing employment with [defendant] by accepting the Alexandria position, but declined.

*Darnell, supra*, at *3. The court noted, however, that a cause of action was not completely

foreclosed when a plaintiff declines a lateral transfer, explaining:

> An employee's rejection of a lateral transfer is always actionable as a 'adverse
> employment action' if the conditions of the transfer would have been objectively
> intolerable to a reasonable person, thereby amounting to a 'constructive
> discharge.'

*Id.*

Here, Plaintiff was offered a lateral transfer in that he was offered the same position, the

same salary and benefits, and he would continue reporting to the same supervisor. (Ex. N to Pl.'s

Br.). He was also offered a stipend for relocation expenses. (*Id.*).

Plaintiff's affidavit states that he declined the transfer because: 1) his "wife is a teacher

licensed here"; 2) his "aged father required [his] attention;" and 3) his "minor son was in

school." (Pl.'s Affidavit).

The Sixth Circuit has held that "purely personal reasons for turning down a transfer are

not sufficient to render a transfer an adverse employment action." *Strouss*, 250 F.3d 336 at 343

n.2; *Darnell, supra*.[11] Plaintiff's reasons for turning down the lateral transfer are personal and

the Court does not believe that Plaintiff has submitted sufficient evidence upon which a

reasonable jury could find that the transfer would have been "objectively intolerable" to a

reasonable person.

4.      <u>Legitimate, Non-Discriminatory Basis For Relocating Plaintiff's Position</u>

Defendant also argues that, assuming *arguendo* that Plaintiff could establish a prima facie

---

[11]The *Strouss* court also cited with approval *Dilenno v. Goodwill Indus.*, 162 F.3d 235, 236 (3rd Cir. 1998) for the proposition that the desire to live in certain city is not a job-related attribute to be considered when determining whether a lateral transfer was an adverse employment action. *Id.*

case, Defendant has a legitimate non-discriminatory reason for the challenged action and Plaintiff cannot establish that reason is pretextual.

Defendant asserts that its decision to eliminate the Senior Contract Administrator position in Troy, where there was no longer a need due to decreased business, and to offer Plaintiff a transfer to Virginia, where there was a need due to a recent resignation, is based on legitimate business reasons. It asserts that the challenged action was contemplated more than a month before any protected activity under the WPA, citing *Wolcott*, 691 F.Supp. 1052 ("employer more than rebutted any presumption of retaliation by offering evidence that phase out of employee's position was contemplated long before employee engaged in activities protected under WPA").

Plaintiff contends that several facts establish that Defendant's asserted business reasons for the challenged action are "just plain false." (Pl.'s Br. at 19). Plaintiff points to the following evidence to establish pretext:

- Plaintiff testified that Defendant "had just won a large contract with Camber" at the time his position was limited and he believed he was going to administer it from the Troy facility. (Pl.'s Dep. at 147-48). He testified that he does not know who administered it after he left. (*Id.*).

- Plaintiff asserts that the "contracting group within Defendant's overall organization was understaffed at the time of Robinson's termination," citing Mailey's deposition transcript at pages 137-39. In those pages, however, Mailey simply testified that he was "understaffed" only when Fadullon left. Notably, Fadullon held the contracts position at the Virginia office that was offered to Plaintiff.

- Plaintiff asserts that he should have been allowed to work in Troy and work remotely on projects in other offices. Plaintiff notes that Defendant had an increase in contract administration work in Virginia and asserts that Plaintiff should have been allowed to do that work remotely from Troy.

- Finally, Plaintiff argues that if only one contracts administrator was needed in Troy, he should have been the one retained because he is more qualified and there is no reason for Defendant to have retained the less qualified and junior contracts position held by

Rinaldi.

Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. Once a defendant articulates a nondiscriminatory reason for the challenged action, the plaintiff bears the burden to prove that the proffered explanation was pretextual. In order to do so, the "plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). The Court concludes that Plaintiff has failed to do so here.

Defendant has submitted evidence to indicate that the challenged action was contemplated a month before any protected activity occurred because business and employee staffing levels in the Troy facility were declining. To the extent that Defendant was "understaffed" in contracts employees, Mailey's testimony simply indicates that it was understaffed when Fadullon resigned from his position in the Virginia office *and Plaintiff was offered that very position*. Finally, Plaintiff's subjective beliefs that he should have been allowed to do contract work in Virginia remotely from the Troy facility, and his subjective belief that Defendant should have eliminated the junior contract position rather than the senior contract position do not alter the analysis because "it is well established that '[t]he soundness of an employer's business judgment may not be questioned as a means of showing pretext.'" *Thomas v. Owen Electric Cooperative, Inc.*, 121 Fed.Appx. 598 (6th Cir. 2005) (quoting *Chappell v. GTE Products Corp.*, 803 F.2d 261 (6th Cir. 1986)).

Accordingly, the Court agrees with Defendant that it is also entitled to summary judgment with respect to Plaintiff's WPA claim on this additional ground.

II.     Plaintiff's Public Policy Claim

In its opening brief, Defendant only challenges Plaintiff's public policy claim on the ground that the WPA is Plaintiff's exclusive remedy.

In it supplemental brief, Defendant challenges Plaintiff's public policy on the following grounds:  1) that the WPA is Plaintiff's exclusive remedy for his claim that he was terminated in retaliation for being about to report to a public body; 2) that Plaintiff's public policy claim cannot be based on internal complaints to a supervisor of alleged unlawful conduct; 3) that Plaintiff has failed to identify any time that he refused to violate any laws; and 4) that Plaintiff cannot sustain a public policy claim because other statutes provide a remedy to him.

A.     Is The WPA Plaintiff's Exclusive Remedy For His Claim That He Was Terminated In Retaliation For Being About To Report To A Public Body?

Defendant notes that the WPA makes it unlawful for an employer to discharge an employee in retaliation for engaging in protected activity.  It contends that because Plaintiff's claims fall within the protection of the WPA, he cannot sustain a public policy tort claim for the same alleged wrongful conduct.  Defendant relies on *Dolan v. Continental Airlines*, 454 Mich. 373 (1997)(The WPA provides the exclusive remedy for an employee who alleges he has been retaliated against for reporting, or threatening to report, an employer's alleged violation of the law.).

Plaintiff's Supplemental Brief on the Public Policy Claim clarifies that he asserts two distinct claims in this action: 1) a WPA claim that Plaintiff was terminated in retaliation for having been about to report suspected violations to a public body; and 2) a public policy claim based solely on Plaintiff's internal actions within Radian in reporting alleged violations or in

35

refusing to violate the law.  Plaintiff confirmed at oral argument that he agrees that the WPA is

Plaintiff's exclusive remedy for his claim that he was terminated in retaliation for being about to

report to a public body.

B.      Does Plaintiff Have A Viable Public Policy Claim Based On His Allegation That He Was Terminated For Failing Or Refusing To Violate The Law?

Both parties agree that to come within the contours of a public policy claim under

Michigan law, under *Sucholdolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 695-96

(1982), a plaintiff employee must establish one of the following exceptions to at-will

employment: 1) he was discharged in violation of an explicit legislative statement prohibiting

discharge of employees who act in accordance with a statutory right or duty; 2) he was

discharged for his refusal to violate the law in the course of employment; or 3) he was discharged

for exercising a right conferred by a well-established legislative enactment.  (*See* Pl.'s Suppl. Br.

at 2; Def.'s Suppl. Br. at 2).

Here, Plaintiff's public policy claim is based upon his allegation that he was terminated

for failing or refusing to violate the law.  (Pl.'s Suppl. Br. at 2).  As the Court understands

Plaintiff's position, however, he is attempting to expand that basis in that he alleges that in

violation of Michigan's public policy, he was terminated for: 1) internally reporting unlawful

conduct; and 2)  failing or refusing to violate the law.

1.      Does Reporting Unlawful Conduct Internally To A Supervisor Qualify As A "Refusal To Violate The Law?"

Defendant contends that Plaintiff's internal complaints to supervisors about unlawful

conduct cannot sustain a public policy claim.  Defendant relies on *Scott v. Total Renal Care Inc.*,

194 Fed.Appx. 292 (6th Cir. 2006) and *Cushman-Lagerstrom v. Citizens Ins. Co. Of America*, 72

Fed.Appx. 322 (6th Cir. 2003).

Plaintiff contends that internally reporting unlawful conduct to a supervisor qualifies as a "refusal to violate the law." Plaintiff relies on *Watassek v. Michigan Dep't of Mental Health*, 143 Mich.App. 556 (1985), *Meury v. Connie Kalitta Services/American Intern. Airways, Inc.*, 181 F.3d 102 (6th Cir. 1999) and *Deneau v. Manor Care, Inc.*, 219 F.Supp.2d 855 (E.D. Mich. 2002).

The Court concludes that *Scott* and *Cushman-Lagerstrom* control on this issue and that under these authorities, a public policy claim cannot be based on internally reporting alleged unlawful conduct to a supervisor.

In *Cushman-Lagerstrom,* the court stated that it was "not persuaded that Michigan has provided a 'public policy' cause of action for an employee who is discharged for reporting violations of law to a superior," explaining:

> First of all, this factual scenarios is not listed among the three public policy exceptions to the 'at will employee' rule. *See Edelberg*, 599 N.W.2d at 786-87. Second, Plaintiff has not identified, and we have not located, any controlling or persuasive Michigan case law that has extended the public policy exception to discharges in retaliation for reporting violations of law to superiors.

*Cushman-Lagerstrom*, 72 Fed.Appx. at 328-29. The court noted Plaintiff's reliance on *Watassek*, and the *Meury* case which relied on *Watassek*, but found such reliance misplaced stating that "*Watassek* is neither controlling nor persuasive." *Id*. at 329-30. In sum, the court held that "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a supervisor." *Id.* A different panel of the Sixth Circuit reached the very same conclusion in *Scott.*

Accordingly, the Court concludes that Plaintiff cannot maintain a public policy claim

under Michigan law based upon internal complaints to his supervisors of alleged unlawful conduct.

2.  Can Plaintiff Proceed With His Public Policy Claim Based On Evidence That He Refused To Violate The Law?

Plaintiff contends that, even without consideration of his allegations that he was retaliated against for internally reporting unlawful conduct to a supervisor, he can still proceed with his public policy claim because he has submitted evidence that he refused to violate the law.

Defendant contends that Plaintiff's public policy claim based on his allegations that he was discharged for refusing to violate the law must fail because he has failed to identify any time that he refused to violate any laws.  Defendant narrowly focuses on Plaintiff's affidavit and asserts that, at best, Plaintiff has shown in his evidence that he was unwilling to sign and approve all management actions needing contract signature.

Relying on *Trombetta v. Detroit, T & I R Co.*, 81 Mich.App. 489 (1978), Plaintiff responds by asserting that a refusal to falsify forms indicating compliance with federal regulations is plainly protected activity.  Plaintiff states that he discovered that Defendant was not complying with federal regulations pertaining to posting jobs before hiring candidates and raised his concerns regarding "pre-selection" with Defendant.  He notes that he was the contract compliance person responsible for approving requisitions for hiring employees under certain projects at the Troy facility and was required to "sign-off" on them, indicating that requisitions met certain federally mandated requirements.

Plaintiff testified that he began to question whether certain jobs had been posted, and began checking to see if they had been posted.  (Pl.'s Dep. at 84 & 94; Ex. AA to Pl.'s Suppl.

Br.).  He states that on another occasion Dave Oughton notified him that he planned to hire a new

employee and told Plaintiff, "Please sign off."  (Ex. I to Pl.'s Br.).  Plaintiff responded by stating

"We are required by the FAR to post all opening.  Mr. Wilman can apply to posting; we can not

pre-select candidates."  (*Id*.).  Plaintiff states that on other occasions, he flat refused to sign off on

unposted positions, such as "requisitions for Mssrs. Laveerdiere and Hurley."  (Pl.'s Suppl. Br. at

6).  For example, Plaintiff testified:

> Q.    And Mr. Laverdiere was preselected, you believe?
> A.    Yes.
> Q.    And what leads you to believe that he was preselected?
> A.    When the requisition came across my desk, I noted on the requisition that
>       Larry Arrol was available, and then the employee – I don't remember what
>       the form is called.  But it was followed immediately by Dave Laverdiere,
>       that he was being hired, and I disapproved that.  And I was chewed out for
>       disapproving by Mr. Macik.
> Q.    What do you mean chewed out?
> A.    He said that he had the right to hire who he wanted to when he wanted to.
>       And I pointed out to him that he needed to be in compliance with the terms
>       and conditions of the contract.  And he called me into his office and he
>       blew up at me.

(Pl.'s Dep. at 90)

Plaintiff also asserts that he refused to "sign off on contract provisions involving

purchase/sell-back transactions for which he, as the contracts officer, was not given complete

information to certify the results, as the federal regulations require."  (Pl.'s Suppl. Br. at 6; Ex.

CC to same).

Accordingly, the Court concludes that, contrary to Defendant's assertion, Plaintiff has

submitted sufficient evidence to create a genuine issue of material fact as to whether he refused

to violate the law by signing off on contract provisions or requisitions when federal regulations

had not been met.  The Court shall therefore deny this ground for summary judgment.

### 3. Does This Claim Fail Because Other Statutes Provide A Remedy?

Finally, Defendant challenges Plaintiff's public policy claim by asserting that it "must be dismissed because he failed to avail himself of the statutory remedies available to him." (Def.'s Suppl. Br. at 5). Defendant asserts that Plaintiff could have filed a complaint with the OFCCP or could have filed a complaint under some other unidentified federal or state statutes or under the FAR.

In response, Plaintiff contends that there is no statutory protection for the conduct at issue here and that Defendant has not identified any such statute.

The Court agrees that Defendant has failed to establish that some federal or state statute provided an actual remedy to Plaintiff for the challenged conduct here. The Court shall therefore allow Plaintiff's public policy claim, based upon his allegations that he was retaliated against for refusing to violate the law, to proceed.

## CONCLUSION & ORDER

For the reasons set forth above, Defendant's Motion for Summary Judgment is hereby GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to Plaintiff's claim under the WPA and that claim IS DISMISSED WITH PREJUDICE. The motion is granted in part and denied in part with respect to Plaintiff's public policy claim. The motion is granted to the extent that the Court rules that Plaintiff cannot maintain a public policy claim under Michigan law based upon internal complaints to his supervisors. The motion is denied with respect all other challenges to Plaintiff's public policy claim.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 24, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 24, 2008, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager